UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>PAUL ERICKSON,<br><br>    Defendant. | 4:19-cr-40015<br><br><br>**DEFENDANT'S MOTION FOR DELAY OF REPORT DATE** |

Defendant Paul Erickson, by and through his attorney of record, Clint Sargent, respectfully moves the Court for a 30-day delay of his July 20, 2020 report for the reasons stated in the attached Exhibits A & B, which are incorporated herein by reference.

Dated this 15th day of July 2020.

> */s/ Clint Sargent*
> Clint Sargent
> MEIERHENRY SARGENT, LLP
> 315 South Phillips Avenue
> Sioux Falls, SD  57104
> 605-336-3075
> 605-336-2593 facsimile
> clint@meierhenrylaw.com

**CERTIFICATE OF SERVICE**

This is to certify that I have served a copy of the foregoing upon counsel via email to opposing counsel, Jeff Clapper.

Dated this 15th day of July 2020.

*/s/ Clint Sargent*
Clint Sargent
MEIERHENRY SARGENT, LLP
315 South Phillips Avenue
Sioux Falls, SD  57104
605-336-3075
605-336-2593 facsimile
clint@meierhenrylaw.com

PAUL ERICKSON

July 15, 2020

The Honorable Karen Schreier
United States District Judge
United States Courthouse
400 S. Phillips Avenue
Room 233
Sioux Falls, SD   57104

Dear Judge Schreier,

I write to you with a simple plea that masks a litany of horrors – but only you have the power to grant me the few precious days that could determine if I survive the sentence which I am preparing to serve.

If you could grant me the mercy of a 30-day delay in reporting to a federal prison, I might be able to resolve a detention facility dilemma that I find almost impossible to believe.  I must make decisions about my life and its quality that I have to believe are unique to the pandemic age in which we find ourselves.  I'm just relieved that I can make this appeal in my own voice – broken though it may be from this entire ordeal.

I learned on Monday that, for a variety of reasons that I am frantically sorting out, I have been assigned to FCI-Terminal Island (San Pedro, CA) to serve my sentence.  For the reasons detailed in this letter, this may not be survivable for me.

But I am informed by legal and medical professionals that there is a slim possibility that I *could* be re-designated to a less draconian facility due to the extraordinary nature of my case and medical condition.  I am also informed that if I do *not* have this re-designation resolved *before* I report to Terminal Island, BOP procedures will effectively deny me any chance at a life-saving alternative.

To even try, I need these extra days ahead of a 7-year prison sentence.  And only you have the power to grant them.  Here is my plea.

1

EXHIBIT

A

1. **FCI-Terminal Island Is The Center of the Worst COVID-19 Outbreak in the Entire Federal Prison System:**

    FCI-Terminal Island (San Pedro, CA), a low-security BOP facility designed to hold 800 men but currently overcrowded with more than 1,000 inmates, by late May reported that "nearly 700 prisoners have tested positive for the coronavirus."[1] "Nine inmates at the facility who were diagnosed with the disease have died since April."[2]

    As panic – and COVID-19 – swept through the facility in April, authorities reacted in unprecedented ways. The entire facility is and is likely to remain on "lock-down" – indefinitely. Inmates are confined to 2 – 4 man cells around the clock except for sporadic meals. And "meals" is a relative term; the kitchen was and remains shut down (inmates have been subsisting on daily sack lunches for over three months).[3]

    Tents were hastily erected in the facility's concrete courtyard in a desperate attempt to space bodies.[4] California Congresswoman Nanette Barragan (who represents San Pedro) reported after touring the facility in May, "While I was there I would hear inmates screaming that were in isolation units, saying, 'Turn on the air! Get us some help! Help me!'"[5]

    In a fantastic effort at preventing virus transmission, on April 17 FCI-Terminal Island cut off all phone and e-mail access for inmates to avoid inmates "touching keyboards and phone handsets."[6] This resulted in a Kafkaesque system in which inmates tried to desperately mail a letter to relatives informing them of their infection. For those inmates slow with a stamp, FCI-Terminal Island promised to notify an inmate's emergency contact person if an inmate was removed to an outside intensive care unit or entered a coma.[7]

    By mandating testing for all inmates incarcerated at FCI-Terminal Island and enforcing rigid segregation and isolation "lock-down" policies, prison officials there have dropped "active" infections dramatically. As of today, there are currently, officially, only 10 active COVID-19 infections on "Terminal Island" – 6 inmates and 4 staff.[8]

---

[1] Emily Elena Dugdale, *The Coronavirus Has Torn Through Terminal Island Prison, Families Want Answers*, LA List (May 20, 2020); https://laist.com/2020/05/20/coronavirus_terminal_island_prison_families_lawsuit.php

[2] Eric Licas, *9th coronavirus-related death reported at Terminal Island federal prison*, Daily Breeze (May 27, 2020); https://www.dailybreeze.com/2020/05/27/9th-coronavirus-related-death-at-terminal-island-federal-prison/

[3] Richard Winton, *Terminal Island prison inmates have worst coronavirus outbreak in federal system*, Los Angeles Times (April 29, 2020); https://www.latimes.com/california/story/2020-04-29/coronavirus-terminal-island-prison-inmates-outbreak

[4] Ibid.

[5] Emily Elena Dugdale, *The Coronavirus Has Torn Through Terminal Island Prison, Families Want Answers*, LA List (May 20, 2020); https://laist.com/2020/05/20/coronavirus_terminal_island_prison_families_lawsuit.php

[6] Clare Hymes, *No phone or email for nearly 4,000 inmates at three federal prisons in effort to fight virus*, CBS News (May 1, 2020); https://www.cbsnews.com/news/coronavirus-no-phone-email-inmates-federal-prisons-california-lompoc-terminal-island/

[7] Ibid.

[8] COVID-19 Tracker, Bureau of Prisons; https://www.bop.gov/coronavirus/

But this progress comes at a staggering human cost.

None of the extreme viral containment strategies detailed above have been lifted at Terminal Island – despite the dramatic drop in active infections.  The simple nasal tests now common there continue to reveal the lingering history of COVID-19 infections with no ability to predict reinfection rates.

One of the incarceration experts with whom I consulted yesterday, who has clients at multiple BOP facilities (including "Terminal Island"), told me of what awaits me upon my arrival there.

After my mandatory "two weeks in solitary" (quarantine), there is an additional week of solitary after I'm assigned to my unit, a continuation of quarantine.  When this entry period to Terminal Island ends, it simply means transition into "lock-down."  No programs, no time outside the cell of any kind, staggered meals if at all.  *With no phone calls or e-mails permitted – not even to my attorneys – from the time I enter until some indefinite point months into the future.*  Such is the price of attempted COVID-19 prevention at FCI-Terminal Island.

But medical experts are quick to point out that the lingering effects of such a massive outbreak on all exposed surfaces in a facility with inadequate air circulation (see Cong. Barragan's observations above) are simply unknown.

The Singapore 2019 Novel Coronavirus Outbreak Research Team published an exhaustive study on May 29 of this year pointing out this danger.  "Viral contamination of the air and surfaces surrounding asymptomatic or recovering COVID-19 patients could have serious implications for outbreak control strategies."[9]

The steps the public now recognizes as necessary to contain spread or reinfection are simply impossible at overcrowded Terminal Island.  Chief of Infectious Diseases at Santa Clara Valley Medical Center, epidemiologist Supriya Narasimhan, MD, notes that even a modestly effective containment strategy requires observance of the minimum CDC recommendations of "a distance of six feet from others when possible . . . meticulous hand hygiene, and cover[ing] their nose and mouth with a face covering or mask."[10]

These steps are not possibilities at Terminal Island.  And I enter with an enormous vulnerability to COVID-19.

---

[9] Po Ying Chia, Kristen Kelli Coleman, *Detection of air and surface contamination by SARS-CoV-2 in hospital rooms of infected patients*, Nature (May 29, 2020); https://www.nature.com/articles/s41467-020-16670-2

[10] Claire Gillespie, *How Long After Having Coronavirus Are You Contagious?  Here's What Doctors Say*, Health.com (July 2, 2020); https://www.health.com/condition/infectious-diseases/coronavirus/how-long-after-coronavirus-are-you-contagious

**2. My Heart Condition Remains Unchanged – But I Could Change It:**

I remain strong following aortic heart valve replacement surgery in January.  But my vulnerability to COVID-19 – as previously detailed to the Court – remains omnipresent.

The largest and most recent study done of COVID-19 patients (published just yesterday) affirms the now medical consensus that COVID-19 specifically targets the hearts of the infected.  "Of the total 1,216 patients [in the study], 667 (55 percent) had abnormalities in their [echocardiogram] scan and one in seven participants had what researchers described as severe abnormalities."[11]  "On average, the participants were aged 62, and 70 percent were male."[12]  My exact demographic.

My cardiac team was fearful of simple exposure to COVID-19 at FPC-Yankton; they could not have imagined that their successful work would be challenged by immersion in such a sea of infection and death as Terminal Island.

The tool that saved and normalized my life after open-heart surgery this past winter – a zero-maintenance / zero-medication miracle pacemaker (only requiring a new battery in 20 years) – appears to be the proximate cause of my possible descent into Terminal Island's COVID hell.

The existence of this implanted medical device might have moved me from "Level 2 Care Facility" Yankton to "Level 3 Care Facility" Terminal Island.

*Were you to grant me a 30-day reporting delay, I would be afforded the time for my lawyers, legal professionals and medical team to appeal this classification – or even find an alternative treatment to my pacemaker.*

But these urgent appeals take more than the three days I have left to "report" to Terminal Island.

**3. My Assignment Appears to Violate BOP Designation Criteria:**

I was and remain the personification of a minimum security, federal prison camp inmate:  I have been convicted of a non-violent offense, I have no prior criminal history, my age (58) and advanced education (graduate school degree) suggest no risk of violence to myself or to others and I have no history of drug or alcohol abuse.

I was given a sentence of less than 10 years and was designated for voluntary surrender to an incarceration facility.

---

[11] Kashmira Gander, *Scans Reveal Heart Damage in Over Half of COVID-19 Patients in Study*, Newsweek (July 13, 2020); https://www.newsweek.com/scans-reveal-heart-damage-over-half-covid-19-patients-study-1517293
[12] Ibid.

4

I easily meet the criteria for assignment to a minimum security federal prison camp – and space is currently available at the only federal prison camp in South Dakota – FPC-Yankton (which reports that space is available for "self-reports").

And yet I was assigned to "Terminal Island" – a facility 1,350 miles away from my home, friends and medical team (when Yankton is next door).  This location and higher security classification appears to violate BOP Designation criteria that emphasize (at the least) placement in a facility less than 500 miles away from a defendant's home (as clearly delineated in the "First Step Act" signed into law in 2019).

If I and my small team of experts were allowed a moment to clarify my "pacemaker" situation, there is a chance that these "over-incarceration" designation errors could be corrected.

4. **A 30-Day Reporting Delay Is It:**

I am asking the Court to grant me a new reporting date to any federal prison facility of August 20, 2020.

Given the length of my prison sentence determined by this Court, I do not intend to use the entirety of these 30 days.  But it seems a reasonable length of time to request a "facility re-designation" based upon what I've learned in an intense several days of research.

Such delays in reporting have become common in other jurisdictions due to COVID-19 concerns surrounding defendants' health and dozens of variations in conditions in other federal prison facilities[13]  But almost all of these cases seem to present far less urgent considerations than face me and my imminent date with Terminal Island.

5. **Conclusion:**

This Court was correct in noting at the time of my sentencing that South Dakota federal prison facilities don't yet seem to have a COVID-19 problem.  This appeared to guide the Court in ordering my quick two-week report date.

But now that we know that I've been ordered into "COVID-19 ground zero," surely justice demands that I be given a short amount of time to address the obvious disparities in my designation process.  And a chance to spare me from having this unprecedented pandemic turn my end-of-life sentence into a sentence that ends my life.

---

[13] Chris Marquette, *Duncan Hunter's prison report date likely pushed back to 2021 due to coronavirus*, Roll Call (May 5, 2020); https://www.rollcall.com/2020/05/05/duncan-hunters-prison-report-date-likely-pushed-back-to-2021-due-to-coronavirus/

# Letter Details

SANFORD CLINIC FAMILY MEDICINE 49TH & OXBOW
3401 W 49TH STREET SUITE 1
SIOUX FALLS SD 57106-2322
605-328-1850

July 1, 2020

PAUL A ERICKSON
4904 OXBOW AVE APT 305
SIOUX FALLS SD 57106

TO WHOM IT MAY CONCERN:

This is to certify that Paul A Erickson has been in my care for many years.

He has had a strong recovery from aortic valve replacement and pacemaker implantation surgery in January of 2020. Patient will require quarterly checks for his pacemaker with yearly in-office visits with his cardiologist. Patient is currently managed with a baby aspirin daily. No other therapy or treatment is anticipated at this time.

However, due to recent extraordinary public health events, it must be noted that patient is a male older than 55 years of age who underwent two open-heart surgical procedures and the implantation of both a biological heart valve and a pacemaker. As such, he is uniquely at risk for complications, potentially severe, from exposure to or contraction of the COVID-19 virus.

Patient should not be exposed to closed environments where COVID-19 concentrations are potentially present. Should patient contract COVID-19, he is a substantial risk for a compromised replacement heart valve or even death.

Sincerely,


Jeffry Meyer, MD

EXHIBIT
B